**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**BECKLEY DIVISION**

| | |
|---|---|
| **AUDREA NICOLE DEAVER,** ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO. 5:13-05776** |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of Social Security,** ) | |
| **Defendant.** ) | |

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Commissioner of Social Security

denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security

Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.

By Standing Order entered March 21, 2013 (Document No. 4.), this case was referred to the

undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit

Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. §

636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the

Pleadings. (Document Nos. 10 and 11.)

The Plaintiff, Audrea Nicole Deaver (hereinafter referred to as "Claimant"), filed applications

for DIB and SSI on September 14, 2010 (protective filing date), alleging disability as of August 1,

2010, due to a nervous breakdown, blood clots in the legs, ADHD, and bipolar disorder.[1] (Tr. at 15,

144-47, 148-56, 177-78, 182.)  The claims were denied initially and upon reconsideration. (Tr. at 65-

69, 71-73, 79-81, 86-88, 90-92.) On March 17, 2011, Claimant requested a hearing before an

Administrative Law Judge (ALJ). (Tr. at 93-94.) A hearing was held on November 3, 2011, before the

---

[1] On her form Disability Report - Appeal, Claimant alleged that her ADHD and bipolar
disorder had worsened, which resulted in decreased concentration and more frequent mood swings.
(Tr. at 235.)

Honorable Susan L. Torres. (Tr. at 28-64.)  By decision dated November 14, 2011, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 15-27.) The ALJ's decision became the final decision of the Commissioner on January 28, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) Claimant filed the present action seeking judicial review of the administrative decision on March 21, 2013, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2011). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining

2

physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2011). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme.

> When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date, August 1, 2010. (Tr. at 17, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "deep venous thrombosis, Protein C deficiency, bipolar disorder, generalized anxiety disorder, history of opioid dependence, and schizoaffective disorder," which were severe impairments. (Tr. at 17, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 20, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform light level work as follows:

> [T]he [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can never climb ladders, ropes, or scaffolds. She must avoid even moderate exposure to hazards such as heights and moving machinery. She requires a sit/stand option to change position every 30 minutes. She is limited to routine, repetitive tasks involving occasional interaction with the public.

(Tr. at 22, Finding No. 5.) At step four, the ALJ found that Claimant had no past relevant work. (Tr. at 26, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a surveillance system monitor, hand packer/sealer, and price marker, at the sedentary and light levels of exertion. (Tr. at 26-27, Finding No. 10.) On this basis, benefits were denied. (Tr. at 27, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on December 22, 1981, and was 29 years old at the time of the administrative hearing, November 3, 2011. (Tr. at 26, 32, 35, 144, 148.) The ALJ found that Claimant had a tenth grade, or limited education, and was able to communicate in English. (Tr. at 26, 36, 182.) Claimant had no past relevant work. (Tr. at 26.)

 The Medical Record

The Court has considered all evidence of record, including the medical evidence and summarizes it herein in relation to Claimant's arguments.

***Physical Impairments***:

In February, 1997, Claimant was diagnosed with deep vein thrombosis ("DVT") and Protein C deficiency. (Tr. at 567-58.) On May 15, 2000, and April 18, 2001, Claimant was diagnosed and treated with Coumadin and Lovenox for DVT of the right leg. (Tr. at 546-47, 552-53, 562.) On November 5, 2009, Claimant presented to Dr. S.K. Shammaa, M.D., with complaints of right ankle swelling and pain for three days with pain radiating up her calf. (Tr. at 297.) Venous doppler ultrasound revealed DVT of the right posterior tibial and popliteal vein. (Tr. at 294.) She was prescribed Coumadin and Lovenox injections. (Tr. at 290.) Follow-up with Dr. Shammaa on November 13, 2009, revealed continued calf tenderness and a positive Homan's sign. (Tr. at 298.) On February 9, 2010, Claimant returned to Dr. Shammaa and reported pain and swelling of the left thigh and pain with weight bearing that had persisted for three days. (Tr. at 299.) Venous doppler ultrasound revealed DVT of the left leg. (Tr. at 278.) Claimant was hospitalized from February 9, 2010, through February 13, 2010, where she was treated with Coumadin 10mg and Lovenox injections every 12 hours. (Tr. at 260-63.)

Claimant presented to Dr. Herbert Oye, D.O., of the West Virginia Vascular Institute on March 12, 2010, for evaluation of left leg pain, swelling, and discoloration with a two month history that had progressively worsened. (Tr. at 306-07.) Venous doppler revealed DVT of the left leg. (Tr. at 430.) Claimant was admitted to Beckley Appalachian Regional Hospital ("B-ARH") where she underwent bilateral lower extremity venogram, TPA treatment, and placed back on Coumadin, and was discharged on March 21, 2010. (Tr. at 306, 370, 417-18, 382-83.)

Claimant was referred to Dr. Carl S. Larson, M.D., an oncologist, for therapeutic treatment for her DVT. (Tr. at 499-500.) On April 2, 2010, Claimant reported only swollen and painful lower extremities. (Tr. at 499.) It was noted that Claimant was not therapeutic with her Protein C deficiency and her medications were adjusted. (Tr. at 500.) An ultrasound of the lower extremities continued to

7

reveal the DVT of the left leg. (Tr. at 376.) Claimant returned on April 30, 2010, and was seen by Nancy Lynch, a certified nurse practitioner, who noted that Claimant was taking Lovenox and Coumadin 25mg. (Tr. at 497.) Claimant reported that she was working two or three days a week and that her legs were slightly swollen and tender at the end of her shift. (Id.) She otherwise had no complaints. (Id.) Ms. Lynch noted no edema on physical exam, assessed persistent DVT, and continued her on Coumadin 25mg and Lovenox 80mg. (Id.)

On June 2, 2010, Claimant reported continued pain and swelling of the left leg, but was negative for DVT. (Tr. at 304-05, 359-60.) Dr. Oye recommended another venogram of the bilateral lower extremities. (Tr. at 305, 360.) On June 15, 2010, she underwent a venogram and left iliac vein angioplasty, which resulted in improvement in edema of the left leg. (Tr. at 309-12, 364, 368-69.) Claimant was examined by Ms. Lynch for a follow-up of her DVTs on June 17, 2010. (Tr. at 495.) Claimant reported that her leg was feeling much better and that the pain had decreased greatly. (Id.) She continued to have some swelling but not as severe as it had been. (Id.) Ms. Lynch continued Claimant on her Coumadin 30mg at night and started her on Lovenox 100mcg subcutaneously through June 21, 2010. (Id.)   On June 28, 2010, however, Claimant reported increased swelling and pain in the left leg. (Tr. at 302-03.) Venous doppler revealed DVT of the left femoral vein. (Tr. at 303.) Dr. Larson continued to monitor and adjust Claimant's medications and noted that she was on lifetime Coumadin treatment. (Tr. at 484-91.) A hospital report from Charleston Area Medical Center ("CAMC"), dated August 4, 2010, noted that Claimant was hemodynamically stable. (Tr. at 569.)

Dr. Muatafa Rahim, M.D., completed a consultative examination on December 17, 2010, at which time Claimant denied any pain, swelling, or any problems since she was diagnosed with DVT in May 2010. (Tr. at 455-59.) Dr. Rahim noted that Claimant walked without any assistive device and had no peripheral edema, swelling, or redness. (Tr. at 455-56.) She had normal motor strength, symmetrical reflexes, intact sensation, normal gait, normal range of motion, and negative Romberg's

sign. (Tr. at 456.) Dr. Rahim further noted that Claimant was oriented fully, had normal speech, and intact memory. (Id.) He assessed bipolar affective disorder, ADHD, nervous breakdown, DVT, Protein C deficiency, and tobacco abuse. (Tr. at 457.) He opined that Claimant would need to take anticoagulation medication for the rest of her life. (Id.)

On January 14, 2011, Dr. Nisha Singh, M.D., a state medical source, completed a form Physical RFC Assessment on which she opined that Claimant was capable of performing light exertional level work with a sit-stand option to relieve pain and discomfort as accommodated by normal breaks, or every two hours for 15 minutes. (Tr. at 475-83.) Dr. Singh assessed frequent postural limitations with the exception that Claimant never climb ladders, ropes, or scaffolds. (Tr. at 477.) However, on the next page of her assessment, Dr. Singh indicated that Claimant did not have any postural limitations. (Tr. at 478.) Dr. Singh also opined that Claimant should avoid even moderate exposure to hazards because she took Coumadin. (Tr. at 480.) Dr. Singh noted that pursuant to Claimant's reported activities of daily living, Claimant would have no difficulty lifting, climbing steps, or standing, but that walking far would be problematic due to her legs swelling. (Tr. at 481.) Dr. Caroline Williams, M.D., affirmed Dr. Singh's RFC assessment as written on February 18, 2011. (Tr. at 511.) Dr. Williams noted that Claimant neither alleged any changes in her conditions nor any new illnesses, injuries, or limitations. (Id.) She also noted that there was no new medical evidence in the file. (Id.)

On February 8, 2011, Ms. Lynch noted that Claimant was taking Coumadin 12mg and was "doing quite well." (Tr. at 484, 519.) She noted that Claimant looked the best she had since she had been going to the clinic. (Id.) Claimant denied any pain in the lower extremities and on exam, Ms. Lynch noted only very slight left lower extremity edema. (Id.) On April 6, 2011, Ms. Lynch again noted that Claimant was doing quite well. (Tr. at 517.) On exam, she noted that Claimant had only mild edema in the right leg and that the left leg was more swollen but had improved greatly. (Id.) On August

9

3, 2011, Ms. Lynch noted that Claimant was feeling "fairly well." (Tr. at 515.) She had no edema in either leg. (Id.) Dr. Larson adjusted her Coumadin level, which at that time was 7.5mg. (Id.)

***Mental Impairments***:

On August 4, 2010, Claimant presented to CAMC with complaints of confusion, headache, and blurred vision. (Tr. at 569-70.) Family members reported that for the prior two weeks, Claimant had been extremely forgetful, had lost her train of thought when talking, had lost track during conversations, and had been extremely afraid of things. (Tr. at 569.) Claimant reported that she recently quit her job less than two weeks prior because she was under a significant amount of stress after she was promoted to assistant manager at a Dollar Store. (Id.) Imaging studies, including a CT scan of her head, were normal. (Tr. at 342-44, 570.) She was diagnosed with an altered mental status, resolved, and rule out schizophreniform disorder. (Tr. at 571.)

On August 6, 2010, two days later, Claimant presented to B-ARH with complaints of stress resulting from her blood clotting issues, as well as reports of depression, anger, irritability, racing thoughts, mood swings, and lack of sleep.[3] (Tr. at 318-20.) She also reported thoughts of paranoia and believed that people were following her, and memory loss. (Tr. at 345, 349-50.) On mental status exam, Dr. Hassan A. "Nick" Jafary. M.D., observed that Claimant was sad and crying, had suicidal ideations but lacked a plan, had poor insight and judgment, was oriented fully, and reported auditory hallucinations. (Id. at 318-19.) Dr. Jafary diagnosed bipolar disorder, rule out schizoaffective disorder; anxiety, not otherwise specified; and opiate dependence; and assessed a GAF of 25. (Tr. at 319.) He admitted her to the psychiatric unit where she was started on medications and her mood and affect improved, her depression decreased, and she expressed no suicidal ideation. (Tr. at 324-25.) Claimant

---

[3] On August 10, 2005, prior to her alleged onset date, Claimant was admitted to the intensive care unit for an overdose of acetaminophen. (Tr. at 558-59.) She had become upset when her boyfriend broke up with her and took three handfuls of pills before she could think what she was doing. (Tr. at 558.)

was psychiatrically stable and discharged three days later on August 9, 2010. (Id.)

Claimant continued to treat with Dr. Jafary at Beckley Psychiatric Service upon her discharge from the hospital. (Tr. at 439-46.) On August 19, 2010, Claimant reported that in the past, she was committed by her mother because she was abusing pain for many years. (Tr. at 439.) She was taking Methadone 90mg, which was being reduced 2mg a week and on that day, she was taking 42mg. (Id.) She reported that she was depressed and had mood swings and was filing for disability. (Id.) With the exception of a depressed mood, Dr. Jafary noted that Claimant's mental status exam essentially was normal. (Tr. at 440.) He noted that she looked better and was calm and alert. (Tr. at 441.) He diagnosed bipolar disorder and continued her on Geodon 60mg. (Id.)

Claimant was seen by Ms. Karen T. Cummings-Lilly, MSW, a licensed social worker on September 3, 2010. (Tr. at 442.) Ms. Cummings-Lilly noted that Claimant said she felt bad and seemed to be overwhelmed. (Id.) Claimant seemed slightly paranoid at times and reported a history of hearing voices. (Id.) Ms. Cummings-Lilly noted that she was unsure of Claimant's motivation for treatment and opined that she was "quite psychiatrically unstable." (Id.) Dr. Jafary increased Claimant's medication. (Id.) On September 10, 2010, Claimant indicated that she was looking forward to starting Suboxene now that she had decreased Methadone to 40mg. (Tr. at 443.) On September 17, 2010, Claimant reported back pain from stopping the Methadone and stated that she was not going to stop taking it, was tearful, and seemed paranoid that Ms. Cummings-Lilly was going to take her children. (Tr. at 444.) Dr. Jafary adjusted her medications and her mood appeared more euthymic and her affect was much brighter on October 8, 2010. (Tr. at 444-45, 537.) Claimant discussed issues about her regaining her children and the details of her relationship that were problematic for her. (Tr. at 445.) She reported that she felt good on October 15, 2010, and was smiling and looked happy. (Tr. at 446, 538.) Claimant continued to take Methadone. (Id.)

On November 30, 2010, Kelly Robinson, M.A., conducted a psychological evaluation for

11

complaints of bipolar disorder, anxiety, and ADHD. (Tr. at 447-54.) Claimant reported episodes of depression with a two day to two week duration characterized by crying spells without sufficient reason, depressed mood, withdrawal from people, sleep difficulty, a diminished interest in activities, low energy, and difficulty concentrating. (Tr. at 447.) She also reported episodes lasting for a few hours characterized by excessive energy, increased goal-directed activities, a decreased need for sleep, easily distracted, racing thoughts, and pressured speech. (Tr. at 447-48.) Claimant reported feelings of nervousness, irritability, abdominal distress, muscle tension, fatigue, shakiness, fearful feelings, and excessive worry. (Tr. at 448.) Ms. Robinson noted that Claimant was receiving treatment through The Methadone Clinic five days per week. (Tr. at 449.)

On mental status exam, Ms. Robinson observed that Claimant was alert and fully oriented, had a dysphoric mood and mildly restricted affect, presented with logical and coherent thought processes, had fair insight and normal judgment, denied suicidal or homicidal ideation, had psychomotor agitation, and normal memory and concentration. (Tr. at 449-50.) She diagnosed bipolar I disorder, most recent episode depressed, moderate; and generalized anxiety disorder. (Tr. at 450.) Ms. Robinson noted Claimant's daily activities to have included talking with her boyfriend and son, taking medication, watching television, talking on the phone, performing personal care, washing dishes by hand, vacuuming three rooms, doing one load of laundry, and cooking. (Tr. at 451.) On a weekly basis, she went shopping and on a monthly basis she attended medical appointments. (Id.) Ms. Robinson opined that Claimant's ability to maintain social functioning was mildly deficient and her concentration, persistence, and pace was within normal limits. (Id.) She further opined that due to her opioid dependence, Claimant was incapable of managing any benefits. (Tr. at 452.)

On December 27, 2010, Dr. Capage completed a form Psychiatric Review Technique on which he opined that Claimant's bipolar disorder, generalized anxiety disorder, and opioid dependence were non-severe impairments that resulted in mild limitations in activities of daily living and maintaining

12

concentration, persistence, or pace; moderate difficulties in maintaining social functioning; and one or two episodes of decompensation each of extended duration. (Tr. 460-74.) Dr. Capage also completed a form Mental RFC Assessment on which he opined that Claimant was limited moderately in her ability to understand, remember, and carry out detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. (Tr. at 574-75.) He opined that Claimant's ability to handle stress and changes in routine were moderately limited and that she was capable of performing "routine repetitive work-related activities in a low-demand setting that does not require fast-paced production or call for more than occasional and superficial social interaction." (Tr. at 576.) Dr. James Binder, M.D., affirmed Dr. Capage's opinion as written on February 18, 2011. (Tr. at 513.)

On April 1, 2011, Ms. Cummings-Lilly noted that Claimant's affect was flat and her speech was slowed. (Tr. at 539.) She noted that Claimant appeared to be suffering from anxiety and depression, that her psychotic symptoms were under control during the day, and that she had paranoid dreams two or three nights a week. (Id.) Claimant was completely dependent on her boyfriend, had crying spells for no reason, and wanted to sleep all the time. (Id.) Dr. Jafary added Wellbutrin SR100mg in the afternoon for 15 days, that was to be doubled if she tolerated the medicine well. (Id.) Claimant reported on May 6, 2011, that she was extremely depressed and wanted to sleep all the time. (Tr. at 540.) Ms. Cummings-Lilly observed a flat affect and a tearful disposition at times. (Id.) Claimant reported that she did not want to go anywhere or do anything except sleep. (Id.) Ms.

13

Cummings-Lilly discussed the possibility of Methadone interfering with Claimant's pleasure receptors. (Id.) Dr. Jafary increased her Wellbutrin XR to 200mg for 15 days and then increased it to 300mg for 15 days. (Id.)

   With the increased medication, Claimant reported on May 20, 2011, that "things are going well." (Tr. at 541.) Her affect was bright, she smiled, and appeared happy. (Id.) Ms. Cummings-Lilly noted that Claimant seemed to be doing very well on the Wellbutrin and noted that she was sleeping well and had good energy. (Id.) On August 12, 2011, Claimant reported that she was doing well, and Ms. Cummings-Lilly again noted that her affect was bright, she made good eye contact and smiled, her thoughts were cohesive, and her speech was goal-oriented. (Tr. at 542.) Claimant reported a 20 pound weight gain, but continued to reported thoughts of paranoia and that people were watching her. (Id.) Ms. Cummings-Lilly noted that Claimant continued to take Methadone 45mg, but that seemed to work well for Claimant. (Id.) On August 26, 2011, Claimant continued to do well, but requested to continue counseling as she neither wanted to be around other people nor wanted to leave her house. (Tr. at 543.) Ms. Cummings-Lilly noted that intellectually, Claimant knew she should leave her house, but liked to stay at home. (Id.) Finally, she noted that Claimant "[h]as done remarkably well given the severity of her illness a year ago." (Id.) Claimant reported on September 9, 2011, that she was "doing okay." (Tr. at 544.) She had a flat affect and maintained poor eye contact. (Id.) Though she was able to tolerate being by herself, she reported being tired and had little energy. (Id.) She reported that she was taking only 200mg of Wellbutrin. (Id.) On September 16, 2011, however, Claimant reported that she was doing better, and Dr. Jafary noted that she was calm and alert. (Tr. at 545.) Dr. Jafary opined that Claimant was "psychiatrically stable," and was sleeping and eating good, had normal speech, had an appropriate affect, denied any suicidal or homicidal ideation, denied any hallucinations or delusions, was oriented, and had good insight and judgment. (Id.) He diagnosed schizoaffective disorder and continued her on Wellbutrin 200mg, Geodon 60mg, Haldol 5mg, and Cogentin 1mg. (Id.)

On October 14, 2011, Ms. Cummings-Lilly stated that Claimant remained fragile, depressed, and anxious. (Tr. at 566.) She noted that Claimant exhibited signs of paranoia, until recently, and that she was unable to go anywhere without being accompanied by her boyfriend. (Id.) She further noted that Claimant isolated herself and that if not for her boyfriend, Claimant "would need placement in a board and care facility." (Id.) She opined that Claimant was not capable of meeting her every day needs. (Id.) She reported that although Claimant supervised her eleven year old son, she only did so for a couple of hours after school until her boyfriend came home. (Id.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in finding that Claimant has the residual functional capacity to perform light work as defined in SSR 83-10 and 20 C.F.R. § 404.1567(b). (Document No. 10 at 15-16.) Specifically, Claimant first asserts that pursuant to SSR 83-12, light work entails a good deal of walking or standing, which is contrary to the sit-stand option assessed by the ALJ. (Id. at 15.) Claimant next asserts that her RFC is more limited than assessed by the ALJ. (Id. at 16.) She asserts that her ability to walk and sit are limited due to continued swelling of her lower extremities and that she testified she was able to walk for only five minutes and to sit for only 15 minutes at a time, and needed to elevate her legs due to the swelling. (Id.) She further asserts that the pain she experienced was of a stabbing nature and at times was so severe that she was unable to walk. (Id.) For these reasons, Claimant asserts that her RFC limits her to less than light exertional level work. (Id.)

In response, the Commissioner asserts that the ALJ reasonably addressed all of Claimant's credibly established functional limitations, and therefore, reasonably assessed Claimant's physical RFC based upon a careful review of the entire record. (Tr. at 10-13.) The Commissioner asserts that the medical record does not establish any extreme limitation in Claimant's ability to sit, stand, and

walk. (Id. at 10.) The Commissioner asserts that Claimant's pain significantly decreased and her swelling was significantly reduced by June 2010, two months prior to her alleged onset date, and that subsequently, Dr. Larson, effectively managed her life-time Coumadin treatment and her associated symptoms were controlled. (Id.) Dr. Larson's treatment notes indicate that Claimant was doing well and that her swelling had subsided by August 2011. (Id. at 11.) The Commissioner further notes that the state agency physicians' opinions support the ALJ's RFC assessment and that none of Claimant's treating physicians either instructed Claimant to elevate her legs or placed any limitations on her ability to sit, stand, walk, or work. (Id.)

The Commissioner asserts that pursuant to SSR 83-12, the ALJ properly relied on the VE to determine that the sit-stand option did not erode the unskilled, light occupational base. (Id. at 12.) The Commissioner asserts that the Fourth Circuit held in Walls v. Barnhart, 296 F.3d 287, 289, 292  (4th Cir. 2002), that SSR 83-12 acknowledged unskilled, light jobs that allowed for a sit-stand option, and that there was no contradiction between SSR 83-12 and the ALJ's finding of non-disability based on the VE's testimony that despite limitations posed by the sit-stand option, the claimant could still perform unskilled light or sedentary jobs. (Id.) The Commissioner asserts that as in Walls, the ALJ posed a hypothetical to the VE that contained a sit-stand option with a change of position every 30 minutes and the VE identified unskilled light or sedentary jobs. (Id. at 12-13.) The ALJ therefore, complied with SSR 83-12, and substantial evidence supports the ALJ's decision. (Id. at 13.)

Claimant next alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in assessing Claimant's mental RFC. (Document No. 10 at 16-18.) Claimant asserts that during the relevant period, she received consistent treatment for her mental disorders and a state agency opinion found her to be impaired moderately in eight functional areas. (Id. at 17.) Additionally, Ms. Cummings-Lilly opined that she remained fragile and required permanent

16

board and care at a psychiatric facility except for the care she received from her boyfriend. (Id.)

Claimant also testified she was constantly anxious and nervous, purposefully secluded herself to

decrease anxiety levels, reported paranoid feelings like people were watching her, and admitted to

depression and frequent crying spells. (Id.) Thus, Claimant contends that she is unable to meet the

basic mental demands of competitive, remunerative, unskilled work. (Id. at 17-18.)

      In response, the Commissioner asserts that contrary to Claimant's argument, the evidence

indicates that Claimant is capable of performing routine, repetitive tasks that involve only occasional

interaction with the public. (Document No. 11 at 13-15.) The Commissioner notes that although

Claimant was hospitalized briefly, it occurred prior to her receipt of medication management and

counseling. (Id. at 13.) The Commissioner notes that her symptoms thereafter were treated effectively

by medication and Ms. Cummings-Lilly noted that she had done remarkably well and Dr. Jafary

concluded that she was psychiatrically stable. (Id. at 13-14.) The Commissioner asserts that the ALJ's

mental RFC assessment is supported by the opinion evidence, none of which contained disabling

limitations or impairments. (Id. at 14.) Finally, the Commissioner asserts that the jobs identified by the

VE fully account for Claimant's mental functional limitations, as they are unskilled and do not require

any significant personal interaction. (Id. at 15.) Thus, the Commissioner asserts that the ALJ's decision

should be affirmed. (Id.)

      Finally, Claimant alleges that the Commissioner's decision is not supported by substantial

evidence because the ALJ erred in according little weight to the opinion of her treating therapist, Ms.

Cummings-Lilly. (Document No. 10 at 18-20.) Claimant asserts that pursuant to SSR 06-03p, an

opinion from a medical source who is not an acceptable medical source may be given more weight if

she has seen the individual more often than the treating source and has provided better support and

explanation for her opinion. (Id. at 19.) Claimant asserts that Ms. Cummings-Lilly was the treating

17

therapist for her for more than a year prior to the hearing and that her opinions are supported by Claimant's testimony. (Id.) Claimant asserts that as the treating source, Ms. Cummings-Lilly is the medical professional most familiar with Claimant's psychological impairments and limitations and that by giving her opinion little weight, the ALJ failed to assess accurately the severity of Claimant's mental impairments. (Id. at 19-20.)

In response, the Commissioner asserts that Ms. Cummings-Lilly is a social worker, and pursuant to the Regulations, is not an acceptable medical source. (Document No. 11 at 16-17.) Pursuant to the Regulations, she is considered an "other source," and her opinion therefore, is not entitled to controlling weight. (Id. at 16.) Rather, her opinion is accorded weight only to the extent that it is supported by the factors set forth in the Regulations. (Id.) The Commissioner contends that Ms. Cummings-Lilly's opinion is inconsistent with and unsupported by her own treatment notes, as she had noted two months prior to her opinion that Claimant had done remarkably well, that the medication had helped control her symptoms, and that the Methadone dosage was working well for her. (Id.) Additionally, Claimant reported that she was doing well, her activities had increased, she had a bright affect, maintained good eye contact and coherent thoughts, and had goal-oriented speech. (Id.) Furthermore, the Commissioner asserts that Ms. Cummings-Lilly's opinion was inconsistent with Dr. Jafary's treatment notes, who assessed that she was psychiatrically stable. (Id. at 16-17.) Claimant's mental status exam essentially was normal. (Id. at 17.) Accordingly, the Commissioner asserts that the ALJ properly considered Ms. Cummings-Lilly's opinion. (Id.)

 Analysis.

1. Physical RFC Assessment.

Claimant first alleges that the ALJ erred in assessing her physical RFC. (Document No. 10 at 15-16.) "RFC represents the most that an individual can do despite his or her limitations or

restrictions." <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2011). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." <u>Id.</u> "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." <u>Ostronski v. Chater</u>, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

<u>See</u> 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (2011).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

<u>Diaz v. Chater</u>, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2011). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

As stated above, the ALJ found that Claimant was capable of performing light exertional level work except that she could never climb ladders, ropes, or scaffolds; must avoid moderate exposure to

20

hazards; and required a sit-stand option to change position every 30 minutes. (Tr. at 22.) Claimant alleges that her ability to walk and sit is more restricted than assessed by the ALJ due to continued leg swelling and pain and the need to elevate her legs. (Document No. 10 at 15-16.) The medical evidence demonstrates and the ALJ found that Claimant's treatment relatively was effective in controlling her symptoms. (Tr. at 24-25.) The ALJ noted that the Beckley Oncology Associate's treatment notes revealed that Claimant felt much better with Coumadin therapy and that swelling was reduced after undergoing a left iliac angioplasty in June 2010. (Tr. at 24, 309-12, 364, 368-69.) By February 8, 2011, the oncology notes indicated that Claimant was doing "quite well" and looked the best she had since going to the clinic. (Tr. at 484, 519.) Claimant denied any pain and had only slight swelling of the legs. (Id.) In April, 2011, Claimant had only mild edema but had improved greatly and as of August 3, 2011, she had no swelling in either leg. (Tr. at 515.)

The opinion evidence also supported the ALJ's RFC assessment. Dr. Singh and Dr. Williams, state agency reviewing consultants, opined that Claimant was capable of performing light exertional level work with a sit-stand option. (Tr. at 475-83, 511.) They opined that Claimant could never climb ladders, ropes, or scaffolds and should avoid even moderate exposure to hazards. (Tr. at 477-80, 511.) Additionally, Dr. Rahim examined Claimant on December 17, 2010, and noted that she walked without any assistive device, walked with a normal gait, had normal range of motion, denied any pain, and did not have any swelling. (Tr. at 455-59.) Neither any consultant that offered an opinion, or an examiner, nor any of Claimant's treating providers placed any physical limitations on Claimant regarding her ability to sit, stand, or walk or advised her to elevate her legs as she alleges that she is required to do. Accordingly, the undersigned finds that Claimant's condition improved with medication and other treatment and that the ALJ's RFC is supported by substantial evidence.

Claimant further argues that pursuant to SSR 83-12, the ALJ assessed a sit-stand option which

erodes the unskilled, light occupational base. (Document No. 10 at 15-16.) Social Security Ruling 83-12, 1983 WL 31253 *4, provides that in some disability claims a claimant is not functionally capable of performing either the prolonged sitting required in unskilled, sedentary jobs or the prolonged standing or walking required of unskilled, light jobs. Consequently, with such unusual limitations, the ALJ should consult a vocational expert "to clarify the implications for the occupational base." Id.

The ALJ found that Claimant "requires a sit/stand option to change position every 30 minutes." (Tr. at 22.) At the hearing, the ALJ first asked the VE the following hypothetical:

> Assume an individual of the same age, education, and work experience as the claimant, and with the following residual functional capacity. First hypothetical, this person can perform light work, can never climb ladders, ropes or scaffolds, must avoid even moderate exposure to hazards, such as heights and machinery. Requires a sit and [phonetic] stand option, change positions every 30 minutes. Is limited to routine, repetitive tasks, and has occasional interaction with the public. Are there other jobs existing in the regional and national economies that could be performed?

(Tr. at 60-61.) The ALJ's following two hypotheticals asked the VE to assume the same individual with additional limitations. (Tr. at 61-62.) Thus, the ALJ followed the mandates of SSR 83-12 by consulting a VE to clarify the implications of the job base of an individual with a need to alternate sitting and standing at a frequency of every 30 minutes. In response to the ALJ's hypothetical, the VE identified two sedentary and one light level job that such an individual could perform, and identified the number of jobs that were available in the national and regional economies. (Tr. at 61.) As the Commissioner points out, the Fourth Circuit found in Walls v. Barnhart, 296 F.3d 287, 291 (4th Cir. 2002), that the ALJ complied with the requirements of SSR 83-12 where the ALJ "consulted with a VE about the implications of the sit/stand option on the occupational base and the VE adjusted certain job categories accordingly." In Walls, the claimant argued the same as Claimant does in this instance and the Fourth Circuit rejected his argument. Id. The Court explained that SSR 83-12 "acknowledges that there are jobs that allow sit/stand options...and the VE's inclusion of sedentary jobs does not mean

he disregarded SSR 83-12's recognition that a sit/stand option negatively impacts the number of unskilled jobs available." Id.

In view of the foregoing, the undersigned finds that the ALJ complied with the mandates of SSR 83-12 and inquired of the ALJ respecting the availability of unskilled jobs allowing for a sit-stand option every 30 minutes. The VE testified as to how such a limitation impacted the unskilled, light occupational base, and identified light and sedentary jobs that existed in significant numbers in the national and regional economies. Accordingly, the undersigned finds that substantial evidence supports the ALJ's decision.

2. Mental RFC Assessment.

Claimant next alleges that the ALJ erred in assessing her mental RFC. (Document No. 10 at 16-18.) She essentially asserts that based upon Dr. Capage's opinion, in which he found her moderately deficient in eight functional areas, and Ms. Cummings-Lilly's opinion, she is more limited mentally than assessed by the ALJ. (Id.) In her decision, the ALJ limited Claimant to performing routine, repetitive tasks that involved occasional interaction with the public. (Tr. at 22.) The undersigned finds that the medical record supports the ALJ's decision.

As summarized above, Claimant was treated by Dr. Jafary, a psychiatrist, for management of her conditions and for medication management upon discharge from the hospital. She also treated with Ms. Cummings-Lilly, a counselor and licensed social worker, for her symptoms. The medical notes reveal that her symptoms greatly improved with medication and that her medication worked for her. (Tr. at 442-43.) Her mood and affect improved, Claimant felt better and looked happier, and her treatment providers noted that she was doing much better. (Tr. at 444-45, 537, 541-42.) Ms. Cummings-Lilly noted in August, 2011, that Claimant was doing very well (Tr. at 541-42.) and Dr. Jafary noted in September, 2011, that she was psychiatrically stable. (Tr. at 545.)

Additionally, the opinion evidence supports the ALJ's RFC assessment. Dr. Capage, a state agency reviewing consultant, opined that Claimant's mental impairments were non-severe and resulted in mild limitations in activities of daily living and maintaining concentration, persistence, or pace; moderate difficulties in maintaining social functioning; and one or two episodes of decompensation each of extended duration. (Tr. at 460-74.) As Claimant noted, he further opined that she was limited moderately in only eight functional areas. (Tr. at 449-50.) Dr. Binder affirmed Dr. Capage's opinions. (Tr. at 513.) The ALJ concluded that Claimant was mildly restricted in her activities of daily living; moderately limited in her ability to maintain social functioning, concentration, persistence, or pace; and had only one or two episodes of decompensation each of extended duration. (Tr. at 21.)

As the Commissioner points out, the ALJ also limited Claimant to performing unskilled work, which "is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. §§ 404.1568(a), 416.968(a) (2011). Pursuant to SSR 85-15, unskilled work typically "involve dealing primarily with objects, rather than with data or people." 1985 WL 56857 *4. Two of the jobs identified by the VE do not require any significant personal interaction which also compensates for any of Claimant's allegations that she does not like to be around other people, as she had complained to Ms. Cummings-Lilly. The Sealer job, Dictionary of Occupational Titles ("DOT") Occupational Code 559.687-014, and Price Marker job, DOT Occupational Code 209.587-034, specifically provide that interaction with other people is not significant. See 1991 WL 683782 and 1991 WL 671802.

Accordingly, in view of the foregoing, the undersigned finds that the ALJ's mental RFC assessment is supported by substantial evidence.

3. Opinion Evidence.

Finally, Claimant alleges that the ALJ erred in giving little weight to the opinion of Ms.

24

Cummings-Lilly. (Document No. 10 at 18-20.) The Regulations require that ALJs consider all evidence from "acceptable medical sources" including licensed physicians and other providers. 20 C.F.R §§ 404.1513(a), 416.913(a). In addition to evidence from acceptable medical sources, the Regulations allow ALJs to "use evidence from other sources to show the severity of [a claimant's] impairment(s) and how it affects [a claimant's] ability to work." 20 C.F.R §§ 404.1513(a), 416.913(a) Social workers are not "accepted medical sources" but qualify as "other sources" under 20 C.F.R. § 404.1513(d) and § 416.913(d). <u>See</u> SSR 06-03p, 2006 WL 2329939 *2. The rules for evaluating acceptable medical source statements and opinions do not apply, therefore, to statements and opinions of licensed social workers. ALJs may consider any opinions of social workers as additional evidence, but they are not required to assign them weight, controlling or otherwise, in their evaluations of evidence.

In this case, Claimant's treating therapist, Ms. Cummings-Lilly, submitted a letter that contained several opinion statements regarding the status of Plaintiff's mental impairments. (Tr. at 566.) The ALJ accorded this opinion little weight because it was provided by a licensed social worker and was unsupported by the record as a whole, including hers and Dr. Jafary's treatment notes. (Tr. at 25.) Ms. Cummings-Lilly opined on October 14, 2011, that Claimant remained fragile and was unable to go anywhere unaccompanied by her boyfriend. (Tr. at 25, 566.) She further opined that if it were not for her boyfriend's support, Claimant would need placement in a board and care facility. (<u>Id.</u>) Finally, Ms. Cummings-Lilly opined that Claimant was incapable of meeting her daily needs. (<u>Id.</u>) Contrary to these opinions, Ms. Cummings-Lilly noted on August 26, 2011, that Claimant had done remarkably well given the severity of her condition one year ago. (Tr. at 20, 25, 543.) The medical notes demonstrate that Claimant's symptoms were treated and controlled with medications, and Ms. Cummings-Lilly noted that the Methadone dosage she was taking was working for her. (Tr. at 20, 25,

541-42.) On August 12, 2011, Claimant was doing well and smiling, had a bright affect, made good eye contact, had goal-oriented speech, and had cohesive thoughts. (Tr. at 20, 25, 542.)

Additionally, Ms. Cummings-Lilly's opinion was inconsistent with Dr. Jafary's treatment notes. On September 16, 2011, Dr. Jafary noted that Claimant was "psychiatrically stable," was doing better, was calm and alert, was sleeping and eating good, had normal speech and an appropriate affect, denied any suicidal or homicidal ideations and hallucinations or delusions, was oriented, and had good insight and judgment. (Tr. at 20, 25, 545.) Furthermore, Ms. Cummings-Lilly's opinion was inconsistent with the opinions of Ms. Robinson, Dr. Capage, and Dr. Binder. (Tr. at 25, 447-54, 460-74, 574-75, 513.)

Claimant aptly argues that in some instances "it may be appropriate to give more weight to the opinion of a medical source who is not an 'acceptable medical source' if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion." SSR 06-03p, 2006 WL 2329939 *5. Given the inconsistencies between Ms. Cummings-Lilly's notes and opinions and between Dr. Jafary's notes and the other opinion evidence of record, Claimant's argument simply fails on the facts of the case. The undersigned finds that the ALJ's decision to accord less weight to Ms. Cummings-Lilly's opinion is supported by the substantial evidence of record.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 10.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 11.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**,

and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Berger, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: August 15, 2014.

R. Clarke VanDervort
United States Magistrate Judge